UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
DAVID GRIST,

                          Petitioner,

     v.

SUPERINTENDENT P. GRIFFIN,

                          Respondent.
--------------------------------------------------------x

                          **MEMORANDUM AND ORDER**
                             14-CV-1964 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

     Petitioner David Grist, appearing *pro se*, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his November 25, 2009, conviction in the Supreme Court of the State of New York, Kings County, for grand larceny in the fourth degree, criminal possession of stolen property in the fourth degree, and criminal mischief in the fourth degree.  For the reasons set forth below, Grist's petition is denied, and this action is dismissed.

## BACKGROUND

     On November 29, 2008, firefighters returning from an alarm noticed a man in a dark jacket and red hat sitting in a car with a broken driver's side window.  When the firefighters approached and questioned him, the man fled.  The firemen gave chase and, despite losing sight of the man, soon found him, no longer wearing the jacket or hat, on the fourth-floor landing of a nearby apartment building.  Seconds later, one of the firefighters recovered the jacket and hat, along with a screwdriver and a woman's wallet, on the fifth-floor landing.  The firefighters radioed for the police.  Police Officer Wael Jaber responded to the scene and arrested the man.

     During subsequent grand jury proceedings, Jaber testified that he arrived at the scene in time to see firefighters escorting a man, later identified as Grist, from the apartment building. (Transcript of Jaber's Grand Jury Testimony (Doc. No. 10, Ex. B) at 7–8.)  Jaber claimed that

one of the firefighters handed him a jacket and a wallet which contained credit cards bearing the name Keyannah Lilley.  (*Id.* at 9.)  This testimony was corroborated by the grand jury testimony of Lilley herself, who testified she returned to her car to find that her wallet, containing two credit cards, had been removed from the glove compartment.  (Transcript of Lilley's Grand Jury Testimony (Doc. No. 10, Ex. C) at 25–26.)

Based on this testimony, Grist was indicted on four charges:  two class E felony offenses – grand larceny in the fourth degree (N.Y. Penal § 155.30(4)) and criminal possession of stolen property in the fourth degree (N.Y. Penal § 165.45(2)) – and two class A misdemeanors – criminal mischief in the fourth degree (N.Y. Penal § 145.00(1)) and petit larceny (N.Y. Penal § 155.25).  The felony counts alleged that Grist had stolen and possessed "credit cards."  In September 2009, Grist went to trial on these charges before Justice John G. Ingram and a jury.

**The Trial**

A total of five witness testified for the prosecution:  Lilley, Jaber, and three of the firefighters – Captain Liam Flaherty, Ronald Broome, and James Lopez.  Lilley testified that during the early morning of November 29, 2008, she parked her white 2001 Nissan Altima on Bergen Street between Schenectady and Troy Avenues, "not too far" from a firehouse located in the middle of that block.  (T. 195–96.)[1]  She left her wallet – which she described as rectangular, 11 inches long, and resembling a "black handbag" – in the glove compartment.  (T. 196, 201.)  According to Lilley, the vehicle was in "good condition" at the time she left it.  (T. 196.)

At about 2:00 p.m. on November 29, 2008, six firefighters were returning to the Bergen Street firehouse in their truck.  Captain Flaherty was in the front passenger seat alongside the driver, Ed Cecchia, while four other firemen, including Lopez and Broome, were in the back.  (T. 91–92, 286.)  When the truck was northbound on Troy Avenue and stopped at a light at the

---

[1] Numbers in parentheses preceded by "T" denote pages in the Trial Transcript (Doc. No. 5-1).

intersection with Bergen Street, Lopez looked east on Bergen Street towards the firehouse, then less than half a block away.  (T. 225.)  He saw an African-American man, wearing a dark coat and a red hat, standing very close to the driver's side window of a white sedan located 50 to 70 yards down the street.  (T. 226.)  At first, the man appeared to be "leaning into" or "putting pressure" on the window.  (T. 226, 237.)  Lopez then saw the window "give way," causing the man to fall into the car.  (T. 238.)

Flaherty looked east on Bergen Street in time to see a man wearing a dark coat and red knit hat "ducking into" the window of a white sedan.  (T. 287.)  According to Flaherty, the man was "standing on the sidewalk putting his whole body into the driver's side window and … moving around inside the car."  (T. 288–89.)  Flaherty asked Cecchia if he knew who owned the car but Cecchia – unable to turn right onto Bergen, a one-way street with traffic heading west – was already driving through the intersection.  (T. 288.)  Flaherty turned on the flashing lights and siren and told Cecchia:  "Go.  I think the car is being broken into."  (T. 288.)

The truck sped around the block, arriving in front of the firehouse and 10 to 20 feet from the white car in somewhere between less than a minute and a minute and a half later.  (T. 95–97, 227–29, 288–89.)  By that time, the man was seated inside the vehicle.  (T. 229, 289.)  Flaherty walked towards the vehicle with Lopez right behind him.  (T. 229, 290.)  When Flaherty was about ten feet away, the man exited the vehicle and faced the firemen.  (T. 290.)  Flaherty, Lopez, and Broome all noticed that the driver's side window of the vehicle was broken, and that shattered glass was on the ground beneath the window.  (T. 99, 144, 231, 290.)  Flaherty asked the man if he owned the car.  (T. 291.)  The man responded in the affirmative, but Flaherty said he did not believe him and continued to approach.  (T. 291.)  The man then fled west on Bergen Street and made a right onto Troy Avenue.  (T. 99, 232, 291.)

The firefighters initially attempted to pursue the man on foot but, weighed down by their heavy protective clothing, soon realized that this was futile.  (T. 99, 232, 292.)  They returned to the truck and drove after him, turning right onto Troy Avenue.  (T. 100, 232, 293.)  However, the firemen lost sight of the man after he rounded the corner onto Troy Avenue.  (T. 110, 232, 293.)

After driving about a block north to the intersection of Troy Avenue and Dean Street without spotting the man, the firefighters exited the truck and began searching on foot.  (T. 111, 295.)  One of the firefighters questioned the driver of bus, who said he had seen someone run into a nearby building.  (T. 113, 295.)  Flaherty and Broome then entered that building:  a multi-story apartment building at 1575 Dean Street.  (T. 113, 295.)  Flaherty immediately headed upstairs.  (T. 297–98.)  As he approached the fourth-floor landing, Flaherty saw a man entering the stairwell from a public hallway.  (T. 298.)  The man was out of breath, with "mucus coming out of his nose like he was running," and he appeared startled to see Flaherty.  (T. 299, 301.)  Although the man was no longer wearing the dark coat or red hat, Flaherty instantly recognized him as the man he had seen on Bergen Street about three minutes earlier.  (T. 299, 301.)  Flaherty grabbed him by the shirt and pushed him up against a wall.  (T. 301.)

Broome, who arrived on the fourth-floor landing shortly after Flaherty apprehended the man, also recognized the man as the person he had seen on Bergen Street a few minutes earlier.  (T. 116.)  When one or both of the firefighters accused him of "breaking into the car around the corner," (T. 117, 301–02), the man claimed that he lived in the building.  (T. 117.)  However, when Broome asked to see identification, the man produced a license which indicated that he lived elsewhere.  (T. 117.)  The man then changed his story, claiming that his girlfriend lived in the building.  (T. 117.)

Flaherty radioed Cecchia and told him to call the police and Broome went up the stairs to the fifth-floor landing.  (T. 121, 242.)  There, Broome found the jacket and red hat, along with a

screwdriver and a woman's wallet or purse.  (T. 121.)  Flaherty and Broome then brought the man and the property outside and waited for the police to arrive.  (T. 122-23, 302.)  At trial, Flaherty, Broome, and Lopez – who saw his two colleagues exit 1575 Dean Street – all identified Grist as the man whom Flaherty accosted on Bergen Street.  (T. 98, 230, 234, 298–99.)

At around 2:30 p.m., Officer Jaber and his partner responded to the scene in their marked patrol car.  (T. 252.)  Jaber spoke to Flaherty, then placed Grist under arrest.  (T. 254.)  Broome gave Jaber the property he had recovered, and Jaber placed the property on the top of his car in order to sort through it.  (T. 255–56.)  At trial, Jaber recalled that the property consisted of a jacket, a red hat, a wallet or "female purse," and a screwdriver.  (T. 256.)  However, the screwdriver rolled off the car and down a nearby sewer.  (T. 256.)  Jaber made no effort to recover it.  (T. 256.)

After placing Grist in the patrol car, the officers drove around the block to Bergen Street, where Jaber observed a Nissan Altima with a broken window.  (T. 257.)  The officers then drove to the 77th Precinct, where Jaber opened the wallet.  (T. 258–60.)  Inside, he found, among other things, debit and credit cards.  (T. 260, 275.)  At trial, Jaber testified that there were at least two separate cards and that one of them bore the Visa logo.  (T. 260–61, 275–76.)  However, he did not voucher or photograph the cards or create a writing describing them.  (T. 261, 277.)  Rather, he contacted Lilley and, when she arrived at the precinct later that afternoon, returned the property to her.  (T. 260, 277.)

At trial, Lilley recalled that Jaber returned the wallet "with basically everything [she] had in it."  (T. 199.)  However, her testimony implied that there was only one card:  an ATM card issued by Municipal Credit Union which had a Visa logo on it.  (T. 197.)  On direct examination, she testified that the card could be used as a credit card, without entering a PIN, and that she only "sometimes" used it as a debit card.  (T. 197–98.)  On cross-examination, however, she testified

that she had been told that the card could be used as a credit card, but that the card could not be used to spend money that she did not have.  (T. 204.)  By the time of trial, Lilley no longer had either the wallet or the card.  (T. 199–200.)

Indeed, none of the evidence recovered by Broome was introduced at trial.  Jaber not only returned the wallet and its contents to Lilley, but returned the jacket to Grist without even photographing it.  (T. 261–62, 274.)  The officer also failed to voucher or photograph the hat and, by the time of trial, could not remember what had happened to it.  (T. 279.)

**The Parties' Motions**

Although the defense apparently made no written motions prior to trial, trial counsel, Laurence Rothstein – the third attorney to appear in the case on Grist's behalf, (T. 187) – made several oral motions during the trial itself.  Upon learning that the wallet had been returned to Lilley and was not going to be produced at trial, Rothstein requested that the court not only give an adverse inference charge but also "instruct the jury on the law requiring that the police preserve the evidence for the defendant to inspect …."  (T. 187.)  After Justice Ingram granted that request, (T. 188), Rothstein moved "to preclude any testimony about the property" pursuant to New York Criminal Procedure Law § 450.10(10).  That motion was denied.  (T. 191.)

After the People rested, Rothstein moved to dismiss the felony counts on the ground that the People had failed to prove Grist was in possession of "credit cards."  (T. 330–31.)  Rothstein asserted that Lilley's testimony established that only one card was stolen and that it was a debit card, not a credit card.  (T. 330.)  While conceding that the felony statutes under which Grist was charged required only proof that the defendant stole or possessed "a credit card or a debit card," Rothstein argued that the People failed to prove what was charged in the indictment.  (T. 330.)  Justice Ingram denied the motion, stating:  "[T]he number of credit cards or debit cards is really not an issue. It does not change the theory of the People's case."  (T. 334–35.)

6

After the defense rested without presenting any evidence, the People moved to amend the two felony counts by replacing "credits cards" with "a credit card or debit card." (T. 358.) ADA Diana Graham-Brogan argued that the amendment would not change the People's theory of the case or prejudice Grist. (T. 358.) Although Rothstein vehemently opposed the amendments, Justice Ingram ruled in the People's favor. (T. 363–64.) Rothstein then moved to recall Lilley to cross-examine her about her failure to mention a debit card before the grand jury. (T. 264.) Justice Ingram summarily denied that motion. (T. 364.)

### The Charge, the Verdict, and the Sentence

Justice Ingram submitted to the jury all four counts charged in the indictment, though he charged grand larceny in the fourth degree and petit larceny in the alternative. (T. 459.) With respect to the felony counts, the judge charged that the People had to prove beyond a reasonable doubt that the stolen property "consisted of a credit card or a debit card." (T. 453, 455.) Justice Ingram also gave a permissive adverse inference charge with respect to lost evidence. There were no objections to any portion of the charge. (T. 469.)

Less than two hours after receiving the case, the jury reached a verdict, finding Grist guilty of criminal possession of stolen property in the fourth degree, grand larceny in the fourth degree, and criminal mischief in the fourth degree. (T. 475–76.) At sentencing on November 25, 2009, Justice Ingram adjudicated Grist a persistent felony offender pursuant to New York Criminal Procedure Law ("CPL") § 70.10. The judge then sentenced Grist to two concurrent indeterminate terms of 15 years to life imprisonment on the felonies and to a concurrent one-year term of imprisonment on the misdemeanor. (Sentencing Transcript at 20.)

### Direct Appeal

Grist appealed his conviction to the Appellate Division, Second Department, raising three grounds. First, Grist argued that the evidence adduced at trial was insufficient to prove either of

the felony counts because those counts charged Grist with stealing and possessing "credit cards," and Lilley's testimony established that she possessed only a debit card.  Second, Grist argued that the trial court's decision to amend the felony counts after the close of the evidence violated his due process rights to fair notice of the charges against him and to be tried on the charges for which he was indicted.  Third, Grist argued that the trial court abused its discretion by sentencing him as a persistent felony offender.

The Appellate Division affirmed Grist's conviction, although two of the five justices voted to modify the sentence by reducing Grist's sentence to two to four years' imprisonment. All five justices agreed that the evidence, viewed "in the light most favorable to the prosecution … was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." *People v. Grist*, 950 N.Y.S.2d 782, 783 (App. Div. 2012).  The justices also unanimously held that the trial court "providently exercised its discretion in granting the People's application to amend the indictment to change the description of the property stolen from 'credit cards' to 'a credit card or debit card,'" and that "the amendment of the indictment did not improperly change the prosecution's theory of the case." *Id.*  With respect to the sentencing point, a three-justice majority held that the sentence imposed on Grist, which was the minimum authorized sentence for a persistent felony offender, was not excessive for someone who was "the very definition of a recidivist." *Id.* at 784.  Two dissenting justices opined that a sentence of 15 years to life imprisonment was "unduly harsh" for someone whose prior convictions were for misdemeanors and low-level felonies arising from non-violent property crimes. *Id.* at 784–85.

Grist applied for leave to appeal to the New York Court of Appeals.  In an order dated February 19, 2013, Chief Judge Jonathan Lippman denied his application. *People v. Grist*, 20 N.Y.3d 1061 (2013).  Grist did not seek a writ of certiorari in the United States Supreme Court.

**Post-Conviction Motions**

In mid-June 2013 – shortly after his conviction became final – Grist filed a *pro se* motion to vacate his judgment of conviction pursuant to CPL § 440.10, in which he raised five issues. First, Grist alleged that Jaber perjured himself before the grand jury by claiming 1) to have recovered a jacket and the stolen items which were, in fact, given to him by one of the firefighters and 2) to have witnessed the firefighters leading Grist out of the building. Second, Grist alleged prosecutorial misconduct during the grand jury proceedings, asserting that the prosecutor not only knowingly permitted Jaber to testify falsely, but also instructed the officer to testify in a way that misled the grand jury to believe that the police department was still in possession of the stolen property. In addition, Grist claimed to have "newly discovered evidence" that the card he allegedly stole was only an ATM card and not a credit card, and that prosecutor misled the grand jury about the number and nature of the cards recovered. (Motion to Vacate and Dismiss Indictment (Doc. No. 5-2, Ex. H) at 2.)

Third, Grist argued that defense counsel provided ineffective assistance because none of his assigned attorneys ever filed an "omnibus motion for purposes of discovery" and failed "to demand a suppression hearing." (Memorandum of Law in Support of Motion to Vacate and Set Aside Judgment (Doc. No. 5-2, Ex. H) at 5.) Grist claimed that defense counsel "never even investigated to see if the [P]eople and or police had complied with [P]enal [L]aw 450.10(10)," (*id.* at 6), were unfamiliar with this statute and, therefore, did not move to preclude introduction of the stolen evidence. (*Id.*) He also claimed that Rothstein ignored the grand jury testimony until after the close of evidence, when he moved to recall Lilley to cross-examine her about her failure to mention a debit card before the grand jury. (Motion to Vacate and Dismiss Indictment at 3.)

Fourth, Grist argued that Justice Ingram erred in sentencing him as a persistent felony offender.  Grist claimed that Lilley's "ATM card" did not meet the definition of "credit card" or "debit card" set forth in New York Penal Law § 155.00(7) & (7-a), and that he should have been charged only with petit larceny.  Grist reasoned that because petit larceny is only a misdemeanor, he should not have been sentenced as a persistent felony offender.

In a Decision and Order dated December 3, 2013, and entered December 10, 2013, Justice Ingram denied the § 440.10 motion.  Justice Ingram held that because all of Grist's claims could have been raised on direct appeal, the claims were barred by CPL § 440.10(2)(c).  (Respondent's Ex J (contained in Doc. No. 5-2) at 2–3.)  Justice Ingram also addressed the merits of Grist's claims.  He held, among other things,  that Grist's allegations that false evidence was presented to the grand jury were insufficient to support a claim under CPL § 440.10(1)(c), since the allegations of wrongdoing were "conclusory, speculative, and unsupported by any evidence," and that Grist's trial counsel provided meaningful representation and was not ineffective.  (*Id.* at 3–7.)  Grist applied for leave to appeal Justice Ingram's ruling, but the Appellate Division denied the application.

**Federal Habeas Proceedings**

While the CPL § 440.10 motion was still pending, Grist filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which he raised some of the same grounds raised in his pending § 440.10 motion.  On January 30, 2014, this Court dismissed Grist's petition for a writ of habeas corpus without prejudice.  *Grist v. Griffin*, No. 13-CV-5806 (RRM), 2014 WL 347465, at *1 (E.D.N.Y. Jan. 30, 2014).  The Court noted that some of Grist's grounds for habeas corpus relief were not yet exhausted, rendering Grist's submission a "mixed petition."  Since Grist had filed his petition less than one month after his conviction became final, the Court

10

reasoned that Grist would still have 11 months after he exhausted his state-court remedies in which to re-file his petition for a writ of habeas corpus.

On March 10, 2014, less than three weeks after the Appellate Division denied Grist's application for leave to appeal Justice Ingram's Order, Grist commenced this action. The instant petition raises four grounds for relief. First, Grist argues that the grand jury proceedings were defective because Jaber gave false testimony and the prosecutor misled the grand jurors to believe that "credit cards" were stolen, even though Lilley admitted at trial that only an ATM card was stolen. Second, Grist advances an ineffective assistance of counsel claim predicated on defense counsel's failure to make pre-trial motions for discovery or the suppression of evidence. Third, Grist argues that the trial court abused its discretion when it sentenced him as a persistent felony offender, despite the fact that his prior convictions were "for low level crimes with no violence." Fourth, Grist argues that his trial counsel provided ineffective assistance because he failed to adequately prepare for trial and to cross-examine trial witnesses about their grand jury testimony.

The People oppose the petition, principally asserting that all of Grist's claims are procedurally barred from federal court review. The People argue that Grist's first, second, and fourth grounds for habeas corpus relief were denied on an independent and adequate state ground when Justice Ingram held that these claims were barred by CPL § 440.10(2)(c). However, the People also address the merits of Grist's claims. First, the People argue that Grist's first and third grounds, which they characterize as "claims of false testimony in the grand jury and excessive sentence" are not grounds for federal habeas relief and are without merit. (Respondent's Memorandum of Law (Doc. No. 5) at 8.) Second, the People argue that Justice Ingram correctly rejected Grist's ineffective assistance claims on the merits and argue that this

decision was not contrary to, or an unreasonable application of, *Strickland v. Washington*, 466 U.S. 668 (1984).

Grist replies to some of the People's arguments in his "Traverse to Return." First, Grist asserts that his ineffective assistance of counsel claims are not procedurally barred because Justice Ingram incorrectly applied CPL § 440.10(2)(c). Citing to *People v. Maxwell*, 933 N.Y.S.2d 386 (2d Dep't 2011) – an Appellate Division decision which held that § 440.10(2)(c)'s prohibition (then codified in § 440.10(2)(b)) does not bar a "mixed claim of ineffective assistance that depends, in part, upon matters that do not appear on the record" – Grist argues that his post-conviction motion was "a Mix Petition." (Traverse to Return (Doc. No. 10) at 1, 3.) However, Grist identifies only one non-record fact on which his ineffective assistance claim relied – namely, an "independent document from the internet" establishing that an ATM card is not a debit/credit card. (*Id.* at 3.)

Second, Grist defends his ineffective assistance claims. He claims that defense counsel should have filed an omnibus motion requesting suppression of Lilley's wallet and discovery, and asserts that because of this failure, Rothstein did not adequately cross-examine the prosecution witnesses. In particular, Grist argues that defense counsel failed to cross-examine Jaber and Lilley using their grand jury testimony, and that the result of the proceedings would have been different if he had done so.

Third, Grist accuses both the prosecution and Justice Ingram of misconstruing his grand jury argument. Grist asserts that he was primarily arguing prosecutorial misconduct, alleging that the prosecutor knowingly introduced false testimony before the grand jury and at trial. Citing to two non-habeas cases, he asserts that dismissal of an indictment can be appropriate if "flagrant misconduct … substantially influenced the grand jury's decision." (*Id.* at 4.) He also

12

argues that Justice Ingram erred in holding that his argument concerning false grand jury testimony was barred by CPL § 440.10(2)(c), alleging that it, too, is a "Mix Claim." (*Id.*)

## DISCUSSION

### I.    Procedural Bar

Preliminarily, the Court must address the People's argument that the Court is precluded from considering the three grounds for habeas relief which were first raised in Grist's § 440.10 motion because these grounds were denied on independent and adequate state grounds. "Federal habeas courts generally refuse to hear claims 'defaulted ... in state court pursuant to an independent and adequate state procedural rule.'" *Johnson v. Lee*, 136 S. Ct. 1802, 1803–04 (2016) (per curiam) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Ordinarily, courts "assess the adequacy of a state ground of decision by examining whether the rule upon which the state court relied is firmly established and regularly followed." *Fulton v. Graham*, 802 F.3d 257, 262 (2d Cir. 2015) (quoting *Downs v. Lape*, 657 F.3d 97, 102 (2d Cir. 2011)). "In exceptional cases, however, the 'exorbitant application of a generally sound rule renders the state ground inadequate' and will not prevent a federal court's consideration of the federal question presented." *Id.* (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)).

In evaluating whether a case presents such exceptional circumstances, courts consider three non-exclusive factors:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision;
>
> (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and
>
> (3) whether petitioner had substantially complied with the rule ... and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003). "In assessing … a state court's denial of collateral review because of a petitioner's failure to raise an issue on direct appeal," the Second Circuit focuses on the second of these so-called *Cotto* factors, which "considers whether state case law indicates that compliance with a procedural rule was required under the specific circumstances of the case." *Fulton*, 802 F.3d at 262–63.

In this case, Justice Ingram held that all of the claims raised in Grist's § 440.10 "could have been raised on direct appeal," and that the claims were therefore barred by the procedural rule set forth in § 440.10(2)(c). Section 440.10(2)(c) requires the state court to deny a motion to vacate a judgment when, "[a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure [to raise the issue on direct appeal]." However, this rule does not require New York courts to dismiss ineffective assistance claims when the "complaint about counsel is predicated on factors … that do not appear on the face of the record …." *Fulton*, 802 F.3d at 263 (quoting *People v. Peque*, 22 N.Y.3d 168, 202 (2013)). To the contrary, "New York courts uniformly hold that where … an ineffective assistance of counsel claim turns on facts that are outside of the trial-court record, the claim *must* be brought in collateral proceedings, not on direct appeal." *Pierotti v. Walsh*, 834 F.3d 171, 178 (2d Cir. 2016) (emphasis in original).

This same rule applies when only "some of the defendant's allegations of ineffectiveness involve matters appearing on the record, while others involve matters that are outside the record." *Id.* When a defendant presents this sort of ineffective assistance claim – called a "mixed claim" – a § 440.10 proceeding "is the appropriate forum for reviewing the claim of ineffectiveness in its entirety." *Id.* (quoting *Maxwell*, 933 N.Y.S.2d at 388). In the case of a

14

mixed claim, "it cannot be said that sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such an appeal." *Maxwell*, 933 N.Y.S.2d at 388 (internal quotation marks and citation omitted). Accordingly, "such a mixed claim, presented in a CPL 440.10 motion, is not procedurally barred." *Id.*

A "state court's reliance on [Section] 440.10(2)(c) to bar [a mixed] claim represents an 'exorbitant application' of the state rule." *Pierotti*, 834 F.3d at 180 (quoting *Fulton*, 802 F.3d at 264). In such instances, § 440.10(2)(c) is "'inadequate' to foreclose review of [an] ineffective assistance of trial counsel claim" and a "district court should decide the merits of the claim." *Id.*

In this case, Grist asserts that the ineffective assistance of counsel claim contained in his § 440.10 motion was a mixed claim. He is mistaken. In fact, all of the alleged errors or omissions attributed to counsel in Grist's § 440.10 motion occurred during or prior to trial and could have been raised on direct appeal. Defense counsel's failure to make an omnibus motion seeking discovery or suppression would have been apparent from a cursory examination of the record on appeal. Rothstein's failure to discover the CPL § 450.10 violation or to move to preclude the introduction of the stolen evidence prior to trial was apparent from the trial transcript. (*See* T. 186–90.) Rothstein's failure to impeach the prosecution witnesses with their grand jury testimony was discussed at trial. (*See* T. 264.) Accordingly, Grist's ineffective assistance claim was properly dismissed by Justice Ingram pursuant to CPL § 410.10(2)(c).

Grist also contends that his § 440.10 claim contending that the prosecutor knowingly permitted witnesses to testify falsely before the grand jury is a "Mix Claim." (Traverse to Return at 4.) Again, Grist is mistaken. To the extent that there were facts supporting this claim – and there are not – they would have been apparent from the grand jury transcript, the salient portions of which were made available to defense counsel prior to trial. Indeed, Grist himself tacitly acknowledges this by faulting Rothstein for failing to cross-examine prosecution witnesses with

their grand jury testimony.  Accordingly, this claim was also properly dismissed by Justice

Ingram pursuant to CPL § 410.10(2)(c).

### Cause and Prejudice

Since Grist's prosecutorial misconduct claim (Ground One) and his ineffective assistance

claims (Grounds Two and Four) were denied on independent and adequate state procedural

grounds, these claims cannot serve as a ground for habeas corpus relief unless Grist can

demonstrate either "cause for the default and prejudice," or that "failure to consider the claim

will result in a miscarriage of justice (i.e., the petitioner is actually innocent)."  *Aparicio v. Artuz*,

269 F.3d 78, 90 (2d Cir. 2001) (citing *Coleman*, 501 U.S. at 748-50); *see Walker v. Martin*, 562

U.S. 307, 316 (2011).  To establish cause for a procedural default, a petitioner must show "some

objective factor external to the defense" that explains why he did not previously raise the claim.

*Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) (citing *Murray v. Carrier*, 477 U.S. 478, 488

(1986)).  To show prejudice, a petitioner must demonstrate that the failure to raise the claim

previously had a substantial injurious effect on the petitioner's case such that he was denied

fundamental fairness.  *Reyes v. New York*, No. 99 Civ. 3628 (SAS), 1999 WL 1059961, at *2

(S.D.N.Y. Nov. 22, 1999) (citing *Murray*, 477 U.S. at 494).

Here, Grist has not even alleged a cause for the procedural default.  Even assuming that

he had, he would be unable to establish prejudice arising from the default since all of the

defaulted claims are entirely meritless.

First, Grist has not established ineffective assistance of counsel.  "To prove ineffective

assistance, a petitioner must show that 'defense counsel's performance was objectively

unreasonable' and that 'the deficient performance prejudiced the defense.'"  *Doe v. United*

*States*, 915 F.3d 905, 910 (2d Cir. 2019) (quoting *Kovacs v. United States*, 744 F.3d 44, 49 (2d

Cir. 2014)); *see Strickland*, 466 U.S. at 687–88.  "Actions or omissions by counsel that might be

considered sound trial strategy do not constitute ineffective assistance." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (internal quotation marks and citations omitted). Indeed, "even strategic choices made after less than complete investigation do not amount to ineffective assistance … so long as the known facts made it reasonable to believe that further investigation was unnecessary." *Id.*

Defense counsel's performance in Grist's case was not deficient. First, Grist has not established that an omnibus motion was necessary. There was no need for a pre-trial motion to obtain discovery because, as Justice Ingram noted, counsel had "received all documents during open file discovery" – a state court practice which obviates the need for motion practice. (12/3/2013 Decision & Order at 6.) Similarly, there is no evidence to suggest that defense counsel had a basis for a suppression motion prior to trial, when Rothstein learned of the CPL § 450.10 violation. Upon learning that the physical evidence which Broome handed to Jaber was missing, Rothstein immediately moved to preclude the introduction of the stolen evidence as a sanction for violating CPL § 450.10. (T. 186–90.)

Second, Rothstein recognized that Lilley's grand jury testimony regarding the nature of the stolen property was inconsistent with her testimony at trial, but "deliberately chose not to cross-examine" her with the grand jury testimony. (T. 368.) Although Justice Ingram interrupted Rothstein before he could explain his rationale, it is clear that Rothstein was intent on arguing that the People failed to establish that the wallet contained "credit cards." Since Lilley's grand jury testimony that she possessed two credit cards would undercut this argument, Rothstein made a strategic decision not to impeach her with this testimony.

Grist also has not established a factual basis for his prosecutorial misconduct claim. There is no evidence that the prosecutor knew that any of the grand jury testimony was false. Its falsity is not established by evidence that the testimony at trial was inconsistent with grand jury

17

testimony; these inconsistencies might have established flaws in the witness recollections of the events of November 29, 2008, but did not establish perjury. Furthermore, even if Grist could establish that the prosecution knowingly presented perjured testimony to a grand jury, this claim is not cognizable on habeas review. *See, e.g.*, *May v. Warden*, 07 Civ. 2176 (BSJ) (GWG), 2010 WL 1904327 at *3 (S.D.N.Y. May 10, 2010) (dismissing habeas claim that prosecutor knowingly presented false evidence to grand jury); *Grant v. Ricks,* Nos. 00–CV–6861, 03– MISC–0066 (JBW), 2003 WL 21847238, at *4 (E.D.N.Y. July 29, 2003) (claim that victim presented perjured testimony before the Grand Jury is not cognizable on habeas review).

In addition, Grist has not established that the failure to consider the procedurally defaulted claims will result in a miscarriage of justice or that he is actually innocent. The proof of Grist's guilt was overwhelming. Flaherty and Lopez both saw a man they later identified as Grist breaking into Lilley's car. Flaherty apprehended Grist minutes later, and Flaherty, Lopez, and Broome all identified him at trial as the man they had seen emerging from the car on Bergen Street. Broome found the jacket and hat the man had been wearing, along with a screwdriver and property stolen from the car, abandoned on a landing immediately above the landing on which Grist was apprehended. Although Lilley's testimony concerning the number and nature of the cards in her wallet was confusing, both she and Jaber testified that at least one of the cards bore the Visa logo and could be used as a credit card. This evidence, taken together, overwhelmingly established Grist's guilt of the three crimes for which he was convicted.

## II.    Merits Analysis

The only one of Grist's grounds for habeas corpus relief that is not procedurally barred is his claim that the trial court abused its discretion by adjudicating him a persistent felony offender and sentencing him to 15 years to life imprisonment. That claim was raised on direct appeal, where it was rejected on the merits.

Federal courts may grant a state prisoner's petition for habeas corpus on claims "adjudicated on the merits" in state court only where the adjudication of each claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence in the State court proceeding." 28 U.S.C. § 2254(d). "Clearly established federal law refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005) (internal quotation marks and citation omitted). A decision is "contrary to" established Federal law if the state court "either applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court] precedent." *Penry v. Johnson,* 532 U.S. 782, 792 (2001) (citation omitted). A decision is an "unreasonable application" of clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* (citation omitted).

The Supreme Court has long held that state sentences which are within the limits set by state statutes may not be reviewed by federal habeas courts. *See Townsend v. Burke*, 334 U.S. 736, 741 (1948). This is because "[n]o federal constitutional issue is presented where … the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992).

In this case, the trial court had discretion to adjudicate Grist a persistent felony offender under New York Penal Law § 70.10. The section defines a persistent felony offender as a person "who stands convicted of a felony after having previously been convicted of two or more

19

felonies." N.Y. Penal Law § 70.10(a).  A New York felony conviction qualifies as one of the two previous felony convictions if "a sentence to a term of imprisonment in excess of one year, or a sentence to death, was imposed therefor" and "the defendant was imprisoned under sentence for such conviction prior to the commission of the present felony."  *Id.* § 70.10(b).  If these criteria are met and the sentencing court "is of the opinion that the history and character of the defendant and the nature and circumstances of his criminal conduct indicate that extended incarceration and life-time supervision will best serve the public interest," the court may "may impose the sentence of imprisonment authorized … for a class A-I felony."  *Id.* § 70.10(d).

In this case, Grist admitted that he was convicted of felonies in New York on more than two occasions and had served time on these before being convicted before Justice Ingram. (Sentencing Transcript at 6, 12–15.)   He did not challenge the constitutionality of any of his prior convictions.  (*Id.* at 15.)  Accordingly, Justice Ingram acted within his discretion by adjudicating Grist a persistent felony offender.

After reviewing Grist's lengthy criminal history and opining that it established Grist had "made a career of crime," Justice Ingram concluded Grist was a "menace to society" and held that "extended incarceration and lifetime supervision" would "best serve the public interest." (*Id.* at 16–20.)  Having made that determination, he imposed the minimum sentence permissible for an A-1 felony:  an indeterminate term of fifteen years to life imprisonment.  *See* N.Y. Penal Law §§ 70.00(2)(a), 70.00(3)(a)(i), 70.10(2).  Since Grist received a sentence within the range prescribed by statute, his sentencing claim is not subject to *habeas* review.  *See Townsend*, 334 U.S. at 741; *White*, 969 F.2d at 1383.

## CONCLUSION

For the foregoing reasons, Grist's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied in its entirety.  The Clerk of Court is directed to enter judgment in favor

of respondent, to mail a copy of that judgment and this Memorandum and Order to Grist, to note a copy of that mailing on the docket sheet, and to close this case.  A certificate of appealability shall not issue, as Grist has failed to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c).  In addition, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for purpose of an appeal.  *See Coppedge v. United States,* 369 U.S. 438, 444–45 (1962).

SO ORDERED.

Dated: Brooklyn, New York
      September 30, 2019

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge